# IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ALASKA

MARY C.,[1]

                    Plaintiff,

v.

MARTIN J. O'MALLEY,[2]
Commissioner of the Social Security Administration,

                    Defendant.

Case No. 3:23-cv-00190-MMS

## **DECISION AND ORDER**

On or about June 25, 2020, Mary C. ("Plaintiff") protectively filed an application

under Title II of the Social Security Act,[3] with an alleged onset date of July 30, 2019.[4]

---

[1] Plaintiff's name is partially redacted in accordance with Fed. R. Civ. P. 5.2(c)(2)(B) and the recommendation of the Committee on Court Administration and Case Management of the Judicial Conference of the United States. *See* Memorandum, Committee on Court Administration and Case Management of the Judicial Conference of the United States (May 1, 2018), https://www.uscourts.gov/sites/default/files/18-cv-l-suggestion_cacm_0.pdf.

[2] Martin J. O'Malley is now the Commissioner of Social Security and is automatically substituted as a party pursuant to Fed. R. Civ. P. 25(d). *See also* section 205(g) of the Social Security Act, 42 U.S.C. 405(g) (action survives regardless of any change in the person occupying the office of Commissioner of Social Security).

[3] Title II of the Social Security Act provides benefits to disabled individuals who are insured by virtue of working and paying Federal Insurance Contributions Act (FICA) taxes for a certain amount of time. Title XVI of the Social Security Act is a needs-based program funded by general tax revenues designed to help disabled individuals who have low or no income. Plaintiff brought a claim under Title II only. Although each program is governed by a separate set of regulations, the regulations governing disability determinations are substantially the same for both programs. *Compare* 20 C.F.R. §§ 404.1501–1599 (governing disability determinations under Title II) *with* 20 C.F.R. §§ 416.901–999d (governing disability determinations under Title XVI). For convenience, the Court cites the regulations governing disability determinations under both titles.

[4] Administrative Record ("A.R.") A.R. 26, 294. The application summary, not the application itself, appears in the Court's record and is dated July 2, 2020. A.R. 294. Pursuant to 20 C.F.R. §§ 416.340-350, a protective filing date establishes the earliest possible application date based on a claimant's oral inquiry about eligibility or a verbal or written statement of intent to file for benefits. Therefore, June 25, 2020, is considered Plaintiff's application filing date. *See* A.R. 26.

Plaintiff has exhausted her administrative remedies and filed a Complaint seeking relief from this Court.[5]  Plaintiff's Opening Brief asks the Court to vacate the Commissioner's decision and remand for further administrative proceedings under sentence four of 42 U.S.C. § 405(g).[6]  The Commissioner filed the Administrative Record as his Answer and a Response Brief.[7]  Plaintiff filed a Reply Brief.[8]

Oral argument was not requested and was not necessary to the Court's decision. This Court has jurisdiction to hear an appeal from a final decision of the Commissioner of Social Security.[9]  For the reasons discussed below, Plaintiff's request for relief at Docket 8 is GRANTED.

## I.      STANDARD OF REVIEW

A decision by the Commissioner to deny disability benefits will not be overturned unless it is either not supported by substantial evidence or is based upon legal error.[10] "Substantial evidence" has been defined by the United States Supreme Court as "such relevant evidence as a reasonable mind might accept as adequate to support a

---

[5] Docket 1 (Plaintiff's Compl.).

[6] Docket 8 (Plaintiff's Brief).

[7] Docket 7 (Notice of Lodging Admin. Record); Docket 12 (Commissioner's Br.).  As of December 1, 2022, the Commissioner's "answer may be limited to a certified copy of the administrative record."  *See* Fed. R. Civ. P., Supp. R. 4(b) of Soc. Sec. Actions under 42 U.S.C. § 405(g) (effective Dec. 1, 2022).

[8] Docket 13 (Reply).

[9] 42 U.S.C. § 405(g).

[10] *Matney ex rel. Matney v. Sullivan*, 981 F.2d 1016, 1019 (9th Cir. 1992) (citing *Gonzalez v. Sullivan*, 914 F.2d 1197, 1200 (9th Cir. 1990)).

conclusion."[11] Such evidence must be "more than a mere scintilla," but may be "less than a preponderance."[12] In reviewing the agency's determination, the Court considers the evidence in its entirety, weighing both the evidence that supports and that which detracts from the administrative law judge ("ALJ")'s conclusion.[13] If the evidence is susceptible to more than one rational interpretation, the ALJ's conclusion must be upheld.[14] A reviewing court may only consider the reasons provided by the ALJ in the disability determination and "may not affirm the ALJ on a ground upon which [s]he did not rely."[15] An ALJ's decision will not be reversed if it is based on "harmless error," meaning that the error "is inconsequential to the ultimate nondisability determination, or that, despite the legal error, the agency's path may reasonably be discerned, even if the agency explains its decision with less than ideal clarity."[16] Finally, the ALJ has a "special duty to fully and fairly develop the record and to assure that the claimant's interests are considered[.]"[17] In particular, the Ninth Circuit has found that the ALJ's duty to develop the record increases when the

---

[11] *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. of New York v. NLRB*, 305 U.S. 197, 229 (1938)).

[12] *Id.*; *Sorenson v. Weinberger*, 514 F.2d 1112, 1119 n.10 (9th Cir. 1975).

[13] *Jones v. Heckler*, 760 F.2d 993, 995 (9th Cir. 1985).

[14] *Ford v. Saul,* 950 F.3d 1141, 1154 (9th Cir. 2020) (citation, alteration, and internal quotation marks omitted).

[15] *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014) (citation omitted).

[16] *Brown-Hunter v. Colvin,* 806 F.3d 487, 492 (9th Cir. 2015) (internal quotations and citations omitted).

[17] *Celaya v. Halter,* 332 F.3d 1177, 1183 (9th Cir. 2003) (quoting *Brown v. Heckler,* 713 F.2d 441, 443 (9th Cir. 1983)).

claimant is unrepresented or is mentally ill and thus unable to protect her own interests.[18] However, this duty exists "even when the claimant is represented by counsel."[19]

## II. DETERMINING DISABILITY

The Social Security Act ("the Act") provides for the payment of disability insurance benefits ("DIB") to individuals who have contributed to the Social Security program and who suffer from a physical or mental disability.[20] In addition, Supplemental Security Income ("SSI") may be available to individuals who do not have insured status under the Act but who are age 65 or older, blind, or disabled.[21] Disability is defined in the Act as follows:

> [I]nability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months.[22]

The Act further provides:

> An individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in

---

[18] *Tonapetyan v. Halter,* 242 F.3d 1144, 1150 (9th Cir. 2001) (citations omitted).

[19] *Mayes v. Massanari,* 276 F.3d 453, 459 (9th Cir. 2001) (citations omitted).

[20] 42 U.S.C. § 423(a).

[21] 42 U.S.C. § 1381a.

[22] 42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A).

significant numbers either in the region where such individual lives or in several regions of the country.[23]

The Commissioner has established a five-step process for determining disability within the meaning of the Act.[24]  A claimant bears the burden of proof at steps one through four in order to make a prima facie showing of disability.[25]  If a claimant establishes a prima facie case, the burden of proof then shifts to the agency at step five.[26]  The Commissioner can meet this burden in two ways: "(a) by the testimony of a vocational expert, *or* (b) by reference to the Medical-Vocational Guidelines at 20 C.F.R. pt. 404, subpt. P, app. 2."[27]  The steps, and the ALJ's findings in this case, are as follows:

**Step 1.**  Determine whether the claimant is involved in "substantial gainful activity" ("SGA").[28]  *The ALJ determined that Plaintiff met the insured status requirements of the Social Security Act through December 31, 2024.  The ALJ then determined that Plaintiff had not engaged in substantial activity since July 30, 2019, the alleged onset date.*[29]

**Step 2.**  Determine whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment significantly limits a claimant's physical or mental ability to do basic work activities and does not consider age, education, or work

---

[23] 42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B).

[24] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[25] *Treichler v. Comm'r Soc. Sec. Admin.*, 775 F.3d 1090, 1096 n.1 (9th Cir. 2014) (quoting *Hoopai v. Astrue*, 499 F.3d 1071, 1074–75 (9th Cir. 2007)); s*ee also Tackett v. Apfel*, 180 F.3d 1094, 1098 (9th Cir. 1999).

[26] *Treichler*, 775 F.3d at 1096 n.1; *Tackett*, 180 F.3d at 1098.

[27] *Tackett*, 180 F.3d at 1101 (emphasis in original).

[28] 20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).

[29] A.R. 28.

experience.  The severe impairment or combination of impairments must satisfy the twelve-month duration requirement.[30]  *The ALJ determined that Plaintiff had the following severe impairments: cervical and lumbar degenerative disk disease and obesity.  The ALJ determined that Plaintiff's diabetes and diabetic neuropathy were non-severe impairments.*[31]

**Step 3.**  Determine whether the impairment or combination of impairments meet(s) or equal(s) the severity of any of the listed impairments found in 20 C.F.R. pt. 404, subpt. P, app.1, precluding substantial gainful activity.  If the impairment(s) is(are) the equivalent of any of the listed impairments, and meet(s) the duration requirement, the claimant is conclusively presumed to be disabled.  If not, the evaluation goes on to the fourth step.[32]  *The ALJ determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.*[33]

Residual Functional Capacity.  Before proceeding to step four, a claimant's residual functional capacity ("RFC") is assessed.[34]  Once determined, the RFC is used at both step four and step five.  An RFC assessment is a determination of what a claimant is able to do on a sustained basis despite the limitations from her impairments, including

---

[30] 20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii).

[31] A.R. 28–29.

[32] 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).

[33] A.R. 29.

[34] 20 C.F.R. §§ 404.1545(a), 416.945(a).

impairments that are not severe.[35]  *The ALJ determined that Plaintiff had the residual functional capacity to perform light work with the following limitations: sitting for six hours and standing and/or walking for six hours in an eight-hour workday with customary breaks; occasional climbing stairs and ramps, but no climbing of ladders, ropes, or scaffolds; frequent balancing, kneeling, and crawling; occasional stooping and crouching; avoiding concentrated exposure to non-weather related extreme cold and non-weather related extreme heat; and avoiding concentrated exposure to vibration, unprotected heights, and hazardous machinery.[36]*

**Step 4.**  Determine whether the claimant is capable of performing past relevant work.  At this point, the analysis considers whether past relevant work requires the performance of work-related activities that are precluded by the claimant's RFC.  If the claimant can still do her past relevant work, the claimant is deemed not to be disabled.[37]  Otherwise, the evaluation process moves to the fifth and final step.[38]  *The ALJ determined that Plaintiff was able to perform her past relevant work as a collector (DOT # 241.367-010, SVP 4).[39]*

**Step 5.**  Determine whether the claimant is able to perform other work in the national economy in view of her age, education, and work experience, and in light of the

---

[35] 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

[36] A.R. 30.

[37] 20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv).

[38] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[39] A.R. 34.

RFC.  If so, the claimant is not disabled.  If not, the claimant is considered disabled.[40]

*The ALJ did not reach step five in her analysis.[41]*

The ALJ concluded that Plaintiff was not disabled at any time from July 30, 2019, the alleged onset date, through October 3, 2022, the date of the ALJ's decision.[42]

## III.   PROCEDURAL BACKGROUND

Plaintiff was considered a "person of advanced age" (aged 55+) on the alleged onset date.[43]  Her past relevant work consisted of work as a collector.[44]  Plaintiff alleged disability due to spinal stenosis.[45]  Her claims were denied at the initial level on September 18, 2020 and upon reconsideration on November 16, 2020.[46]  On August 10, 2021, she appeared and testified telephonically without representation before the assigned ALJ.[47]  On October 3, 2022, the ALJ issued an unfavorable ruling.[48]  On June 28, 2023, the

---

[40] 20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).

[41] A.R. 34.

[42] *Id.*

[43] A.R. 294.  *See* 20 C.F.R. §§ 404.1563, 416.963.

[44] A.R. 34.

[45] A.R. 315.

[46] A.R. 206, 222.

[47] A.R. 172–85.  The ALJ notified Plaintiff that she was conducting the hearing via telephone "due to community measures to stop the spread of the virus, COVID-19."  A.R. 160.  The ALJ confirmed Plaintiff's intent to represent herself at the hearing.  A.R. 162.

[48] A.R. 26–34.

Appeals Council denied Plaintiff's request for review.[49]  On August 24, 2023, Plaintiff timely appealed to this Court.[50]

## IV.      DISCUSSION

Plaintiff is represented by counsel in this appeal.  Plaintiff alleges that the ALJ failed to identify any clear and convincing reasons for rejecting her subjective complaints.[51] Specifically, she asserts that the ALJ "selectively discussed only the evidence that supports her conclusions and did not explain her consideration of the evidence that supports Plaintiff's alleged limitations."[52]  The Commissioner disagrees and asks the Court to affirm the ALJ's decision.[53]

### A.      Subjective Reports and Testimony

On July 15, 2020, Plaintiff completed a function report.  In the report, she stated that she would still be employed but for her spine and cervical condition.  She reported that she was unable to sit or stand for extended periods of time and would have to sit when walking distances.  She also reported not sleeping well at night, "primarily due to aching legs, restless feet, neck and hands."  She indicated that she could perform limited household chores with her husband's help and that her husband primarily did the cooking "due to my inability to stand for long periods of time in addition to my limited reach and ability to lift heavy meals."  She reported that her driving was limited because of her

---

[49] A.R. 1–6.

[50] *See* Docket 1.

[51] Docket 8 at 13–21.

[52] Docket 8 at 21.

[53] Docket 12 at 3–10.

restricted range of motion and safety concerns. She indicated that she watched television, did painting, and engaged in social media and smart phone apps, but needed breaks and did stretching. She reported that she could not walk more than two laps around a track before needing to rest 10 to 15 minutes.[54]

At the August 10, 2021, hearing, Plaintiff testified that she could perform self-care and drive herself to appointments and short grocery trips, but that she didn't drive very much because of her neck. She testified that her husband performed 99% of the household chores, including cooking, cleaning, vacuuming, laundry, making beds, taking out the garbage, and gardening. Plaintiff indicated that she was not able to bend down, look down, or turn her head. She also indicated that sitting caused her legs to go numb and she had to stand up. Plaintiff testified that she was able to watch television and do some reading ranging from a couple of hours to five hours, but she could not sit the entire time. She testified that she had to sleep separately from her husband because she had "to get up, walk around, my legs are really weak, my neck gets uncomfortable, I'm just moving around a lot." She also testified that she experienced incontinence issues and that she had notified her neurologist of these issues at her previous appointment.[55]

1. *Legal Standards*

An ALJ's assessment of a claimant's symptoms has two steps.[56] First, the ALJ determines whether the claimant has presented "objective medical evidence of an underlying impairment which could reasonably be expected to produce the pain or other

---

[54] A.R. 333–41.

[55] A.R. 178–83.

[56] *Trevizo v. Berryhill*, 871 F.3d 664, 678 (9th Cir. 2017).

symptoms alleged."[57]  In the first step, the claimant need not "show that her impairment could reasonably be expected to cause the severity of the symptom she has alleged; she need only show that it could reasonably have caused some degree of the symptom.  Nor must a claimant produce objective medical evidence of the pain or fatigue itself, or the severity thereof."[58]

Second, if the claimant has satisfied step one and the ALJ has determined that the claimant is not malingering, the ALJ must provide "specific, clear and convincing reasons" for rejecting the claimant's testimony regarding the severity of the claimant's symptoms. This standard is "the most demanding required in Social Security cases."[59] Yet, this does not mean an ALJ is required to "simply accept a claimant's subjective symptom testimony notwithstanding inconsistencies between that testimony and the other objective medical evidence in the record, allowing a claimant's subjective evidence to effectively trump all other evidence in a case."[60]

Here, the ALJ determined that Plaintiff's impairments could reasonably be expected to cause some of the alleged symptoms that Plaintiff described.  The ALJ then found that Plaintiff's statements concerning the intensity, persistence, and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record.[61]  Because the ALJ found Plaintiff's underlying impairments

---

[57] *Id.* (quoting *Garrison,* 759 F.3d at 1014–15).

[58] *Garrison,* 759 F.3d at 1014 (internal citations and quotations omitted).

[59] *Trevizo,* 871 F.3d at 678.

[60] *Smartt v. Kijakazi,* 53 F. 4th 489, 499 (9th Cir. 2022).

[61] A.R. 31.

severe and cited no evidence of malingering, the ALJ was required to provide specific, clear, and convincing reasons, supported by substantial evidence, for rejecting Plaintiff's subjective symptom allegations.

The ALJ provided the following reasons for discounting Plaintiff's symptom testimony and reports: (1) Plaintiff's hearing testimony was inconsistent with her reports of improvement in the record; (2) Plaintiff's decision to stop physical therapy from March to June 2020 and failure to seek treatment for her lower extremity symptoms after December 2021, suggested improvement and stability; (3) Plaintiff "required only conservative treatment" for her neck, back, and lower and upper extremities; and (4) through approximately May 2021, treatment notes "reflect an unremarkable clinical presentation, with little or no abnormality in gait, balance, or lower extremity strength."[62]

### 2. Reports of Improvement of Symptoms

"[E]vidence of medical treatment successfully relieving symptoms can undermine a claim of disability."[63] However, making "some improvement does not mean that the person's impairments no longer seriously affect her ability to function in a workplace."[64] And as district courts in the Ninth Circuit have recently articulated, "improvement is a relative term, the significance of which depends on the severity of the baseline symptoms and the amount of the improvement."[65] Here, the ALJ discounted Plaintiff's subjective

---

[62] A.R. 31–33.

[63] *Wellington v. Berryhill,* 878 F.3d 867, 876 (9th Cir. 2017) (citing 20 C.F.R. §§ 404.1520a(c)(1), 416.920a(c)(1)).

[64] *Holohan v. Massanari,* 246 F.3d 1195, 1205 (9th Cir. 2001).

[65] *Garza v. Comm'r of Soc. Sec.,* 2024 WL 519762, at *12 (E.D. Cal. Feb 9, 2024); *see also e.g., Julianna A. v. Acting Comm'r of Soc. Sec.,* No. 2:20-CV-1163-DWC, 2021 WL 3464922, at *6 (W.D. Wash. Aug. 6, 2021) ("Improvement is a relative term.").

complaints because Plaintiff reported "marked improvement" in her symptoms following surgery, including her balance and upper extremity pain, numbness, and weakness.[66] The ALJ also noted that Plaintiff reported improvement in her back and lower extremity symptoms with physical therapy and massage.[67]

Plaintiff asserts that "the ALJ's reference to Plaintiff's reports of improvement following surgery is not a clear or convincing reason for discounting her alleged symptoms."[68] Specifically, Plaintiff alleges that the ALJ's references to improvement after surgery are selective and fail to "state a basis for discounting the symptoms that Plaintiff continued to experience despite her partial improvement."[69] The Commissioner counters that Plaintiff's reported improvements and the findings on examination support the ALJ's evaluation.[70]

Before the relevant disability period, Plaintiff was diagnosed with multilevel cervical spinal stenosis with evidence of myelopathy at C3-4, C4-5, C5-6, and C6-7, as well as mild degenerative changes in the lumbar spine.[71] The provider recommended surgery, noting that "if she does decide to take a wait and see approach . . . she needs to be very vigilant about increasing symptoms of myelopathy such as worsening hand function, gait disturbance, weakness, or sensory disturbance and certainly any worsening of bowel or

---

[66] A.R. 32.

[67] A.R. 33.

[68] Docket 8 at 15.

[69] Docket 8 at 15–16.

[70] Docket 12 at 5.

[71] A.R. 392.

bladder control issues . . .[O]nce they develop they can be permanent[.]"[72]  Shortly after, in December 2018, Plaintiff underwent cervical fusion surgery.[73]

Treatment notes after Plaintiff's December 2018 surgery and before May 2021 are mixed, but the longitudinal record indicates that while Plaintiff reported improvement, she also continued to experience extremity weakness and to report associated limitations throughout the relevant disability period.  For example, in May 2019, Plaintiff reported 60-70% improvement in upper extremity strength and was able to wash her hair and clean her house, avoiding only heavy lifting at that time.  However, she continued to report bilateral lower extremity weakness and lumbago.[74]  At a follow up appointment in September 2019, Plaintiff reported that overall she was "98% better" following surgery, "citing marked improvement in balance, lower extremity hypoesthesia and weakness, upper extremity symptoms, and visceral disturbance."  But at that same appointment, she continued to complain of "tight" thighs, that her "feet are on rocks," and her chief complaint continued to be bilateral anterior subcostal region pain.[75]  A month later, her provider noted that Plaintiff "has done very well with global neuromuscular improvement" following her surgery in December 2018 and that Plaintiff had improved "tremendously" in terms of balance and strength, but Plaintiff felt that she had "reached a plateau."  In the same record, Plaintiff also continued to report lower extremity dysesthesias and weakness.  The provider recommended a trial thoracic epidural steroid injection based on "fairly significant

---

[72] A.R. 393.

[73] A.R. 676.

[74] A.R. 417.

[75] *Id.*

T7/8 [herniated nucleus pulposus] with truncal radicular features and some impact to the cord."[76]  Her provider provided a referral for continued physical therapy for "resolving cervical myelopathy but persistent thoracic disc herniation/mild cord insult with lower extremity weakness primarily in [the] thighs."[77]  About one year after her December 2018 surgery, Plaintiff reported that her numbness and tingling in the bilateral legs was "85% better" from surgery, but she reported that it still affected her quality of life.[78]

The record also shows that Plaintiff's physicians thought the damage to her spinal cord was permanent.  For example, in April 2020, her neurologist opined that Plaintiff was clinically stable because "[a]t this juncture her residual neurological symptoms are likely permanent and represent permanent spinal cord changes that occurred prior to the surgical intervention."  At the time, the neurologist did not feel that additional surgery would make a difference, but also noted that any decompensation could be related to "recurrent demyelination or further development of spondylotic [changes]."[79]  In August 2020, the provider again noted that Plaintiff's current symptoms were likely secondary to permanent damage to her spinal cord.[80]  In February 2021, another provider opined that "without significant changes from [Plaintiff's] last MRI, that [the] most likely explanation of

---

[76] A.R. 412.

[77] A.R. 415.

[78] A.R. 586.

[79] A.R. 569.

[80] A.R. 623.  Also on October 1, 2020, the provider opined that Plaintiff's reported muscle weakness could be "a residual function of her known prior cervical myelopathy.  If so, it would be expected to remain stable and possibly improve over time."  A.R. 651.

her continued symptoms is that they represent permanent spinal cord damage and there would be nothing further we could offer from a neurosurgical standpoint."[81]

In May 2021, Plaintiff's symptoms clearly worsened.[82] Her neurologist observed a "spastic gait" and slightly decreased hand grips. He noted that he could only offer symptomatic treatment.[83] In August 2021, Plaintiff reported chronic neuropathy and weakness in her legs and feet.[84] In September 2021, Plaintiff's neurosurgeon observed an abnormal gait pattern, unsteady gait, and postural instability.[85] The next month, Plaintiff was treated for left arm pain due to falling while going down some stairs. The provider also noted mildly reduced strength in Plaintiff's left-handed grip and slightly diminished sensation in the left fingers.[86]

Plaintiff underwent lumbar spine surgery in October 2021.[87] After surgery, Plaintiff reported normal postoperative pain and some reduction in her preoperative symptoms in the lower extremities and lumbar spine.[88] However, she continued to experience weakness from her knees up to the pelvis.[89] At an evaluation in February 2022, Dr. Miller,

---

[81] A.R. 698.

[82] The ALJ acknowledges that the treatment notes after May 2021 show a change in Plaintiff's clinical presentation, but the ALJ characterized this worsening as "transient." *See* A.R. 32–33.

[83] A.R. 702–03.

[84] A.R. 814.

[85] A.R. 54.

[86] A.R. 811–12.

[87] A.R. 882.

[88] A.R. 99, 872, 876.

[89] A.R. 808.

Plaintiff's neurosurgeon, opined that her "significant thoracic spine spinal cord injury/myelitis" was "likely responsible for the majority of her symptoms." He noted that "the vast majority of her balance and gait issues are due to her spinal cord injury." He anticipated a "slow partial recovery."[90]

Eight months after Plaintiff's second spinal surgery, her provider noted that she no longer required ambulatory aids. Despite this, Plaintiff continued to report gait instability, balance issues, upper and lower extremity numbness, and tingling in hands and feet. Her neurosurgeon wanted Plaintiff to return in three months to evaluate her hand weakness and continued neck pain.[91] Two days after the ALJ's decision, Plaintiff's neurosurgeon noted that Plaintiff continued to have "bilateral lower extremity paresthesias and sensory deficits along with truncal ataxia related [to] her spinal cord injury in the thoracic cord."[92] Her gait pattern was abnormal with an unsteady gait and postural instability. She needed cane assistance.[93]

Plaintiff also participated in physical therapy for pain in the thoracic spine, neck pain, weakness, abnormal posture, and low back pain. Plaintiff reported improvement following physical therapy sessions, but also reported continuing discomfort, tightness, soreness, and pain.[94] Her therapists continued to observe muscle tightness in the neck,

---

[90] A.R. 99.

[91] A.R. 112–121.

[92] A.R. 15.

[93] A.R. 17.

[94] *See e.g.,* A.R. 460 (twisting feeling is better but her legs still feel tingly), 466 (reported limitation in movement and range of motion and continues to have the discomfort she came in with, but her PT opined that Plaintiff's "functional abilities have improved significantly"), 478 (reported dizziness with reaching while bending and with some motions of the neck, and numbness and tingling in

shoulders, low back, and thoracic back and weakness in the lumbar spine, lower extremities, hips, and shoulders.[95]

Although the treatment record is mixed, it was error for the ALJ to point only to the portions of the record in which Plaintiff admitted improvement after surgery. Without considering the greater context, including how severe Plaintiff's baseline symptoms were, how significant the improvement was, and her physicians' opinions that the damage to her spinal cord was permanent, the ALJ's conclusion that Plaintiff's testimony and subjective reports were inconsistent with her reports of improvement to physicians is not supported by substantial evidence. Moreover, the period from May 2021 through the date of the ALJ's decision shows a distinct worsening of Plaintiff's symptoms and functionality.

### 3. Failure to Seek Treatment

An "unexplained, or inadequately explained, failure to seek treatment" or follow a prescribed course of treatment may constitute a clear and convincing reason to discredit a claimant's subjective symptom complaints.[96] Consequently, the ALJ must consider the claimant's reasons for not seeking treatment or failing to follow treatment protocols.[97]

---

the lower extremities), 490 (reported doing better overall and feeling less intense pain in the mid-thoracic region, but continued to have questions about lower extremity symptoms), 508 (reported that her PT exercises were going well and that massage helped with confidence and abilities, but also reported still felt weak in the upper body and neck).

[95] *See e.g.,* A.R. 431, 433, 435, 437, 439, 443, 445, 449, 456, 460, 462, 466, 470, 472, 474, 477, 486, 492, 494, 496, 498, 500, 502, 506, 518, 526, 528, 530.

[96] *Orn v. Astrue,* 495 F.3d 625, 638 (9th Cir. 2007) (internal citation omitted).

[97] *See Smolen,* 80 F.3d at 1284; *see also* SOCIAL SECURITY RULING (SSR) 16-3p, 2017 WL 5180304, at *9 ("We will not find an individual's symptoms inconsistent with the evidence in the record on this basis without considering possible reasons he or she may not comply with treatment or seek treatment consistent with the degree of his or her complaints. We may need to contact the individual regarding the lack of treatment or, at an administrative proceeding, ask why he or she has not complied with or sought treatment in a manner consistent with his or her complaints.").

In this case, the ALJ concluded that Plaintiff's decision to stop physical therapy from approximately March through June 2020 reflected symptom improvement. The ALJ also determined that Plaintiff's symptoms were stable and improving because there was no evidence that Plaintiff returned to her neurosurgeon, Dr. Miller, after December 2021.[98]

### a. Decision to Stop Physical Therapy

The ALJ rejected the explanation given by Plaintiff to her providers that she stopped physical therapy due to COVID-19.[99] The ALJ reasoned that Plaintiff's explanation was not reflected in a June 2020 treatment note discharging Plaintiff because she had not been seen "nor contacted the clinic for 3 months."[100] The ALJ also cited a treatment record from August 2020 as inconsistent with Plaintiff's reported reason for stopping physical therapy because Plaintiff "continued going to the gym five to six times a week."[101]

The ALJ cherry-picked evidence from a mixed record regarding Plaintiff's physical therapy attendance.[102] For example, in the August 2020, Plaintiff reported *"[s]truggling*

---

Social Security Rulings are "binding on all components of the Social Security Administration, ... and are to be relied upon as precedents in adjudicating cases." *Orn*, 495 F.3d at 636.

[98] A.R. 33.

[99] A.R. 33. In April 2020, Plaintiff reported discontinuing her physical therapy sessions due to the COVID-19 pandemic. A.R. 652. Plaintiff also reported in August 2020 that she had been participating in physical therapy, but she discontinued in March 2020 due to COVID-19. A.R. 620.

[100] A.R. 33. *See* A.R. 554.

[101] A.R. 33. *See* A.R. 579.

[102] *See Attmore v. Colvin,* 827 F.3d 872, 877 (9th Cir. 2016) (The ALJ is required to examine evidence in the broader context of the claimant's impairment. "In short, the examples an ALJ chooses 'must *in fact* constitute examples of a broader development.' ") (internal citation omitted).

*to exercise due to leg weakness* but going to Planet Fitness 5-6x weekly."[103]  Plaintiff continued to report lower extremity weakness and walking limitations at her neurology appointment that same month.  Specifically, Plaintiff described slow transitions from seated to walking and a limited ability to walk "due to the feeling that her legs are weak."[104]

Without more, the June 2020 discharge notice and the August 2020 record[105] do not constitute substantial evidence of symptom improvement.  Although going to the gym instead of attending physical therapy may indicate an improvement in Plaintiff's symptoms, the ALJ made no inquiry into the circumstances surrounding the apparent inconsistency.[106]  The timing of and motivation for Plaintiff stopping physical therapy is equally unclear.  Plaintiff may have initially stopped physical therapy because of the COVID-19 pandemic and then, at some time before August 2020, she began going to the gym.  Simply assuming Plaintiff experienced symptom improvement based on this ambiguous evidence is not adequate.

Accordingly, substantial evidence does not support the ALJ's conclusion that Plaintiff's discharge from physical therapy in June 2020 and her reports of going to the gym reflected symptom improvement.

    b.    *Return to Dr. Miller after December 2021*

---

[103] A.R. 579 (emphasis added).

[104] A.R. 620.

[105] On September 22, 2020, Plaintiff also reported that "after a year of supervised physical therapy she has discontinued formal supervised rehabilitation and has been exercising on her own at the gym several days a week."  A.R. 628.

[106] *See* n. 97; SSR 16-3p, 2017 WL 5180304, at *9.

The ALJ also discounts Plaintiff's testimony for the stated reason that the record does not show evidence of Plaintiff's return to her neurosurgeon or other specialist for her neck and upper extremity symptoms after December 2021. This reason does not appear to be factually accurate. On February 2, 2022, the treatment record from Dr. Miller notes that Plaintiff "is being seen today . . . for [n]ew patient with cervical pain."[107] Moreover, the ALJ's conclusion does not account for Dr. Miller's opinion that Plaintiff's thoracic spinal cord injury was responsible for most of her symptoms.[108]

In sum, the examples cited by the ALJ as demonstrating improvement by a failure to seek treatment are not supported by substantial evidence. This is not a specific, clear, and convincing reason to discount Plaintiff's symptom complaints.

### 4. "Conservative" Treatment

"[E]vidence of 'conservative treatment' is sufficient to discount a claimant's testimony regarding severity of an impairment."[109] Here, the ALJ discounted Plaintiff's subjective complaints for the stated reason that Plaintiff's treatment after cervical spine surgery in December 2018 was "only conservative." The ALJ also found that after Plaintiff's lumbar spine surgery in October 2021, her physicians "did not note findings of concern that warranted more than conservative treatment measures."[110]

_____

[107] A.R. 99.

[108] A.R. 99. *See Orn,* 495 F.3d at 638 ("[I]n the case of impairments where the stimulus to seek relief is less pronounced, and where medical treatment is very unlikely to be successful, the approach to credibility makes little sense.").

[109] *Parra v. Astrue,* 481 F.3d 742, 751 (9th Cir. 2007) (quoting *Johnson v. Shalala,* 60 F.3d 1428, 1434 (9th Cir. 1995)).

[110] A.R. 32.

Plaintiff alleges the ALJ failed to acknowledge that Plaintiff's providers "repeatedly told her that her symptoms were permanent, and there was no surgical treatment available" for her neck and upper extremity symptoms.[111] The Commissioner counters that the ALJ reasonably found that Plaintiff's use of over-the-counter medication after surgery in December 2018 "coupled with Plaintiff having only mild myelopathy," indicated that Plaintiff's symptoms were less severe than she alleged.[112]

The ALJ's finding that Plaintiff required only conservative treatment is not a clear and convincing reason to discount Plaintiff's symptom complaints in this case. As discussed in detail above, Plaintiff's providers repeatedly noted that although Plaintiff was clinically stable after her December 2018 surgery, her neurological symptoms, including numbness and weakness in her lower extremities and hands, were likely permanent.[113] At multiple visits between September 2021 and October 2022, Plaintiff's neurosurgeon noted that "[c]onservative therapy had no effect on symptom progression."[114] And arguably, two surgeries in a span of three years with unchanged to worsening symptoms between them, does not constitute conservative treatment.[115]

5. *Clinical Presentation and Objective Evidence*

---

[111] Docket 8 at 19.

[112] Docket 12 at 6.

[113] *See e.g.,* A.R. 569, 623, 628, 651, 698. *See also Christin D. v. Kijakazi,* 2024 WL 4132436, at *6 (D. Nevada Sept. 10, 2024) ("The ALJ here did not cite any evidence in the record that suggested Plaintiff opted for conservative treatment in lieu of more aggressive treatment after her back surgery, or that indicated a more aggressive option was recommended or even available.").

[114] *See e.g.,* A.R. 11, 48, 61, 75, 101, 113.

[115] *See Trevizo,* 817 F.3d at 677 (identifying "aggressive interventions" to include back surgery).

"When objective medical evidence in the record is *inconsistent* with the claimant's subjective testimony, the ALJ may indeed weigh it as undercutting such testimony."[116] However, "an ALJ may not 'reject a claimant's subjective complaints based solely on a lack of medical evidence to fully corroborate the alleged severity of pain.' "[117] Here, the ALJ found that, "[a]part [from] rare findings of weakness in some lower extremity muscle groups, the notes through about May 2021 reflect an unremarkable clinical presentation, with little or no abnormality in gait, balance, or lower extremity strength."[118] She pointed to an electrodiagnostic study of the lower extremities that indicated no evidence of radiculopathy, plexopathy, or neuropathy.[119] The ALJ also noted that in March 2021, Plaintiff's neurologist "characterized the claimant's lower extremity function symptoms as mild residual cervical myelopathy."[120]

Because the Court has concluded that the ALJ erred by rejecting Plaintiff's symptom testimony and reports for the reasons discussed previously, inconsistency with clinical presentations and certain objective findings is the only remaining reason. Because symptom testimony cannot be discounted based solely on a conflict with objective medical evidence, the Court need not address the ALJ's reasons. Accordingly, the ALJ erred by rejecting Plaintiff's symptom testimony.

### B.    Scope of Remand

---

[116] *Smartt,* 53 F.4th at 498 (emphasis in original).

[117] *Smartt,* 53 F.4th at 494–95 (citing *Burch v. Barnhart,* 400 F.3d 676, 681 (9th Cir. 2005)).

[118] A.R. 32.

[119] A.R. 32, 698.  However, the October 2021 post-operative report diagnosed Plaintiff with L4-5 stenosis with disk herniation and radiculopathy.  A.R. 147.

[120] A.R. 33, 701.

Plaintiff requests that the Court vacate the SSA's final decision and remand for further proceedings pursuant to the fourth sentence of 42 U.S.C. § 405(g).[121] Moreover, when prejudicial error has occurred, "the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation[.]"[122]

As discussed above, the ALJ did not provide specific, clear, and convincing reasons, supported by substantial evidence, for discrediting of Plaintiff's subjective symptom testimony and complaints. Consequently, there are outstanding issues that must be resolved before a determination of disability can be made. This case is remanded for further administrative proceedings consistent with this Decision and Order.

## V. ORDER

The Court, having carefully reviewed the administrative record, finds that the ALJ's determinations are not free from legal error and are not supported by substantial evidence. Accordingly, IT IS ORDERED that Plaintiff's request for relief at Docket 8 is GRANTED. The Commissioner's final decision is VACATED and REMANDED for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g) and consistent with this Decision and Order. The Court directs the Clerk of Court to enter judgment in favor of Plaintiff and close this case accordingly.

DATED this 28th day of September 2024, at Anchorage, Alaska.

_____
MATTHEW M. SCOBLE
CHIEF U.S. MAGISTRATE JUDGE

---

[121] Docket 8 at 21.

[122] *Dominguez v. Colvin,* 808 F.3d 403, 407 (9th Cir. 2015) (quoting *Treichler,* 775 F.3d at 1099).